The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. I now call the first case for argument, Huawei Technologies v. Iancu, case number 2019-1494. Mr. Trello, whenever you're ready. Thank you, Your Honor. Good morning, and may it please the Court. In its decision in this IPR proceeding, the Board rejected four of the five asserted grounds of unpatentability, but it accepted the fifth because it made two key mistakes. It misconstrued the claims by holding that they do not require that a synchronized mobile device always ignore timing deviation information in a contention-based random access process, and it misread the R1-072-197 reference to teach a mobile device applying or ignoring timing deviation information based on the device's synchronization status. Mr. Trello, this is Judge Wallach. Yes, Your Honor. On page 23, footnote 4 in the Blue Brief, Huawei says that, and I'm quoting now, the contention resolution referenced in TS-36-300 is essentially a placeholder, with most of its provisions for further study. How does that affect the explicit disclosure of TS-36.300? Well, I don't think it affects it other than to indicate perhaps that the compilers of TS-36-300 recognized that there could be contention problems, which you would expect in a contention-based random access process, and that they would need to be resolved somehow. But beyond that, I think the indication was FFS for further study, and it does not provide any means of resolving any contention-related problems. On page 55, this is Judge Wallach again. On page 55 of the Blue Brief, Huawei says, and I'm quoting, Dr. Mattis said he said nothing about the mobile device entering synchronous status after applying the original TA command. He said only that the mobile device, and you have internal quotes, has a synchronous status at that point, and contends that the distinction is crucial, and the board's failure to recognize it is fatal to its analysis. You're saying that in the Blue Brief. Where in the record did Huawei point out that crucial distinction, saying it was a crucial distinction? Well, Your Honor, the emphasis on Mattis saying has a synchronous status and the board reading that to say enters a synchronous status, well, that first appeared in the final written decision. Now, Huawei made clear throughout that the mobile device in the R1 reference is always in synchronous status. That was our position all along, and the board, in fact, recognized that we were arguing that it was always in synchronous status. So phrased in terms of a crucial distinction, no, we didn't say that because nobody had suggested that has means enters until the final written decision. But the fact that the mobile device in R1 was always in synchronous status was a key part of the argument from the beginning. On page 30 of the Red Brief, this is Judge Wallach again. On page 30 of the Red Brief, the director says, quoting, this is not a case where the prior art gives no direction as to which of many possible choices is likely to be successful, nor does the claimed electronic circuitry qualify as unpredictable arts. And that, and I'm quoting them again, Huawei waived consideration of this issue by failing to properly raise it to the board. So where did Huawei properly raise this before the board? We raised it, Judge Wallach, at appendix pages 449 to 450. We point out that Samsung, the petitioner, has made no showing, hadn't even mentioned reasonable expectation of success. And at appendix page 50, the board recognized that we made that argument. They didn't suggest any waiver or forfeiture, but they just didn't address it. They just, you know, blew past it. And so, and I think the director, and the director concedes that we did in fact raise it, but suggests that we didn't say enough about it. But the point was that reasonable expectation of success is an essential requirement of the obviousness analysis. The petitioner, the one challenging the validity, the patentability of the claims, didn't address it at all, and that's a fatal flaw. There's no burden on Huawei then to go forward and prove the negative, that no person of ordinary skill could have reasonably expected success. The burden was on Samsung. Samsung ignored it, and the board ignored Samsung's failure. So that's, I don't think there's any waiver here. Mr. Trello, Mr. Trello, this is complicated technology, and I need some help in trying to understand what the contentions are. If I understand correctly, you're trying to make a distinction between timing information, which causes a change from an asynchronous to a synchronous state, and timing information, which is just maintenance information, which adjusts the relationship so it's more synchronous. Is the timing information, timing deviation information within the meaning of the claim, information that is involved in the R1 transmissions? No, I don't believe it is, Judge Dyke, because the timing deviation information in the claims, it's specifically defined in the claims to be timing deviation information included in a random access response in a contention-based random access process, and that is different than the timing adjustment information that is used in the R1 reference. Among other things, the R1 reference is not dealing with a contention-based random access process, which means that it's using completely different communication channels. The R1 reference is using dedicated uplink and downlink channels between the base station and the mobile device, whereas the patent and the TS36300 reference are using the contention-based process where essentially the information is broadcast to all mobile devices in the area. Where do I find in the patent a teaching that tells me that there's a difference between maintenance timing information and synchronous timing information, which I understand is the distinction that you're making? And you're saying that, and correct me if I'm wrong about this, that the R1 method doesn't deal with synchronicity but only with maintenance. But how do I know that when the patent talks about timing deviation information, it's only talking about one category and not the other? Well, I'm not sure that I can add anything to what I tried to explain a moment ago, Judge Dyke, but I'll try. The claims are talking about, first of all, they're talking about devices in synchronous and asynchronous status, and they're talking about information in a random access response in a contention-based random access synchronization process. That is different, and there was never any dispute that that is different than the timing the random access synchronization process. Okay, but is it fair to say that the issue that I'm asking about is sort of at the heart of what you're getting at? Well, I think what is at the heart of what we're getting at is that these are very different processes. No, but it's the difference between maintenance timing information and synchronous timing information. That's the distinction that you're making. Am I correct? Yeah, that is certainly a key distinction, Judge Dyke, absolutely. And it's a key distinction because, in part, the processes are very different. I don't want to repeat myself, but using different channels and the problems that the patent is addressing can't arise in the R1 system, and the problem that R1 is addressing can't arise in the random access system that the patent is talking about. Mr. Trello, this is Sharon Proust. And I think Mr. Mattel can correct me if I'm wrong, but I think this is somewhere in the argument that the solicitor is making before us. I agree with Judge Dyke. This is enormously complex. But is it unfairly simplistic to just parse out of the board's opinion that it concluded that the TF-36 teaches timing signals on a per-need basis, and then to take R1, using R1 only for the broad teaching that mobile devices can make the decision whether to ignore unnecessary commands? Under substantial review, why can't we tease out enough in the board to affirm on that basis? Well, Your Honor, for a couple of reasons. One is because I don't think that's actually the finding the board made. And let me take a couple of steps here. One is that at appendix pages 18 and 19 and 24, the board specifically found, pardon me, that the TS reference did not teach the ignoring limitation. And in fact, the undisputed expert testimony was that the mobile device at issue in the TS reference never ignores timing information. Well, clearly they're getting the ignoring step from R1. Yeah, absolutely, and that's the next point I was going to make. The board did not, contrary to what the director said, the board did not rely on R1 only to say that the mobile device can make the decision whether to ignore or apply. It needed R1 to find the ignoring limitation because it's not in TS. And we think that when the claims are properly construed and R1 is properly read, it's not in R1 either. And so I don't think that the – I think it would be overly simplistic because I don't think the board – that's not the analysis the board applied. The board relied on R1 to teach the ignoring limitation, and it needed to rely on it because it's nowhere else in the prior art. And we don't think it's there either, but, you know, that's the mistake the board made, I think. So what you're saying is that R1 teaches ignoring maintenance correction information but doesn't teach ignoring information that's essential to synchronicity. Is that fair? Well, that's fair. I would also maybe put it a little bit differently, which is that R1 teaches – R1 doesn't teach ignoring based on the synchronous or asynchronous status of the mobile device because the mobile device is always synchronized. So it really doesn't teach anything about the mobile device doing anything based on synchronization status, and that's really what the claims are all about. And that's, I think, the fundamental misreading of the – that the board made of the R1 reference based on its misreading of Mattacetti's testimony. Well, it really depends on whether there's a material difference between ignoring maintenance timing information and ignoring synchronicity timing information, whatever the line may be between those two. Well, I think that's certainly true, but it goes, I think, a little bit further because, again, the claims require – the claims have these basically two mutually exclusive paths. You do one thing if you're synchronous. You do another thing if you're asynchronous. And R1 has nothing to say about that because the mobile device there is always synchronous. Okay. We heard the gong a few minutes ago, but we'll restore your rebuttal time, Mr. Trella, and why don't we hear from the PTO now. Thank you. Thank you, Your Honor. Mr. Mattal, whenever you're ready. Thank you. Your Honor, may it please the Court? I suppose I should home in on the issue that Judge Dyke raised in his questions. There are two parts of the R1 reference that I'd like to direct the Court's attention to that, I think, provide more than ample evidence to sustain the Board's conclusions about that reference. It's a short reference. It's at pages 3265 through 666 in the record. And at the very introduction of – 3265. 3265 through 666. In the introduction of the reference at the very beginning, the reference itself makes clear that it's about the transmission of an uplink timing advance to ensure synchronous operation of the mobile device. So the reference opens up by explaining that it's there to ensure the synchronicity. And then the key aspect of the reference, which is at the bottom of the next page, that the Board relied on to find that whether the timing advance command is ignored or not depends on synchronous operation is the two scenarios the reference describes where the mobile device sends either a positive or a negative acknowledgement back. Where are you on this page? On page – let's see. 326 – this is Judge Wallach. I think you're referring to the UE can ignore a timing advance command if the UE has already performed the timing advance command. Yes, yeah. I misspoke earlier. It's at page 3267. And this is about the middle of the page. So the reference describes a scenario where – But give us – wait, wait. Is it the paragraph beginning in the second case? Yes, yeah, in the paragraph above that in the first case. But the Board describes scenarios here where a timing advance had been sent by the base station. And in the R1 reference, a message is always sent back to the base station to acknowledge whether or not that's been received. In the first scenario, it properly – it receives a timing advance command, sends back a positive acknowledgement, and the base station misinterprets that and says, oh, this was – thinks it's a negative acknowledgement and therefore sends another timing advance command. R1 makes clear that in this scenario, the mobile device can ignore that new timing advance command. So direct quote from the reference, and that's all the Board needs to conclude that this is a reference that describes a scenario where if your timing is already correct, you don't need to process that other command. And the decision to ignore it can be made right at the mobile device. Do you agree that there's a difference, as Mr. Trella is suggesting, between maintenance timing information and timing information that relates to synchronicity? It's a slight difference. And once you teach a person a skill in the art, that you need to make these adjustments. First of all, the Board simply concluded that whether you're adjusting timing just to stay on the right path or whether you're completely out of synchronization, it all relates to synchronization. And the reference itself describes that if a timing advance isn't processed, for example, then you have incorrect timing. When you're correcting for incorrect timing, for example, I think that provides ample basis to conclude that this itself relates to synchronization, even if the device isn't so completely unsynchronized that it can no longer communicate at all with the base station. Well, is that what synchronization means? If it's asynchronous, it can't communicate with the base station at all? If it's completely asynchronous, then at some point it loses its ability to communicate. But the R1 reference also contemplates degrees of asynchronization where you can still communicate with the base station, but you're beginning to be misaligned. And if it's not fixed, you eventually will lose the connection. And the board has effectively concluded that that's also a type of asynchronous status. Again, the reference expressly refers to the timing being incorrect and refers to correcting that. The board reasonably could read that as, you know, if you're making a new command because of incorrect timing, you're making it in relation to synchronicity or asynchronicity. That sounds like a claim construction dispute as to whether synchronicity includes maintenance information. Yeah, there was no claim construction fight raised over this particular issue. But as you get deeper into the references, that is, you know, there is some dispute about that. But even if one were to construe the reference another way and say completely asynchronicity only means when you're completely out of asynchronicity, R1 still teaches you that you need to make these adjustments to avoid falling into asynchronicity. That's the whole purpose of the reference to avoid a situation where you completely lose communication. And by teaching that to a person of skill, making these maintenance adjustments to avoid complete asynchronicity, you effectively also teach that person that you'd make the same decisions in relation to complete asynchronicity, even if, you know, partial asynchronicity were not the same thing as asynchronicity for the purposes of the claims. If there's another point I could emphasize, you know, the briefing on this appeal is all focused on the R1 reference, but R1 actually wasn't even the principal reference in this case. The board found in the first substantive 10 pages of its decision, this is pages 15 to 25 from the record, that it's actually TS36300 that meets virtually all the limitations of the claims. At page 20, the board summed up everything it found and noted that the only thing that was disputed by Huawei was whether that final ignoring decision could be made at the mobile device or at the base station. From pages 20 to 25, the board analyzed the competing evidence, and it finally credited the testimony of Huawei's expert that although the decision could be made at either device, the reference didn't actually show it being made at the mobile device, and therefore the petitioner hadn't met its burden. That was the only element that was missing from TS36300 and that the petitioner needed to identify in the R1 reference. And the R1 reference undisputedly teaches that the ignoring decision can be made at the mobile device. Not only is there substantial evidence for that in the examples from page 3267 that I described earlier, but this point was effectively conceded by Huawei. As the board notes, at 43 through 44 of its decision, Huawei conceded that the R1 reference does show making the ignoring decision at the mobile device. The board could have noted that Huawei also conceded this point in a surreply. I'm referring to a passage at page 620 of the record where Huawei stated in the context of a motivation to combine argument that the R1 reference does teach ignoring a timing advance command. Just last Thursday, this court issued a decision that made clear that these statements by a patent owner describing the scope and content of the prior art are binding through the proceeding. I'm referring to the court's decision in Group B, Boston Scientific, number 1370 from 2019. In that case, this court actually reversed the board for failing to have considered and attributed appropriate ways to a patent owner. What statement are we talking about? What statement, this admission are we talking about here? At page 43 through 44, the board describes how in its preliminary response, Huawei conceded that this ignoring that the R1 reference does show making an ignoring decision at the mobile device. Now, Huawei still disputes whether the reference is similar enough that a person of skill would have looked to it, argues it's not analogous enough, and there's no motivation. But the only element that was actually still needed after TS 3600 is showing that you can make the decision whether to ignore that timing advance command at the mobile device and not just at the base station. Well, I understand what you're saying, but it seems to me that you're not entirely defending what the board said. Because if I understand what the board said, it said that the R1 method or whatever it is brings it into synchronicity. And if I understand correctly, you don't seem to be defending that. Am I mistaken? Well, I am defending it on the basis of, again, the examples at page 3267 in the R1 reference where it describes making or not making the processing of a new TA command based on whether the timing is correct or incorrect. The reference clearly describes... In other words, you're defining synchronicity as the kind of timing, is including the kind of timing information that's in the R1 reference, right? Yes, yes. And not only is there that overlap, but again, by teaching the person of skill that you need to make these adjustments in order to stay and avoid falling into complete asynchronicity, it would at least suggest to that person that you make these decisions in relation to that ultimate goal as well. And again, you know, it's really... This case was really about TS-36-300. That was the principal reference the petitioner relied on. The petitioner actually argued TS-36-300 shows everything. And Huawei, again, didn't contest that it does show almost all of these limits. It's just that last element and the decision to ignore these commands being made at the mobile device. That element is amply shown in the R1 reference. And in fact, Huawei effectively conceded that at various points throughout the proceeding. You know, this was always principally a case about that other reference. And there's very little work that is called on for the R1 reference to serve. And it more than fulfills that purpose. It clearly shows, again, in the words of that reference, the mobile device can ignore the new timing advance command. That provides ample basis for the board's conclusion that it satisfies that one last piece that was missing from TS-36-300. If there are no further questions from the panel, I'm prepared to yield the balance of my time. I don't have it. No. That's fine. Thank you very much. And Mr. Trella will restore all of your rebuttal time. I'll turn to you. Thank you, Your Honor. Let me pick up roughly where counsel left off. He was correct, he is correct, that the TS reference was the primary reference below. He's not correct in describing how much it teaches. In fact, it's not just a question of whether an ignoring decision can be made at the mobile device. The board found, and this is at appendix pages 18 and 19 and also appendix page 24, that TS doesn't teach anything at all about ever ignoring a timing advance command. And in fact, as I think I mentioned in my opening section, the expert testimony was clear that it doesn't disclose any circumstances under which timing advance commands would ever be ignored. So it's not just a question of where can you make the decision, it's whether would a mobile device ever ignore timing advance information received from a base station. So when you say timing advance information, you mean timing information that distinguishes between synchronicity and asynchronicity because it certainly does ignore some timing information, right? Well, not in the TS reference. Oh, I'm sorry, in the R1 reference, yes. Yes, correct, and that's where I was about to go. The R1 reference actually is carrying a lot more weight than counsel suggests because it needs to show that timing advance information, timing adjustment information in that case, can be ignored. And so it needed to do that, and as I explained, the board misread the R1 reference to teach that it applies or ignores based on synchronization status, and it doesn't. And I think there was a significant choice of words in counsel's argument when he said the board effectively concluded that what R1 is talking about is a kind of asynchronous status. Well, the board didn't conclude that. The board concluded that it was actual asynchronous status because of the confusion between, you know, has asynchronous status and enters asynchronous status when it applies that TA command. And it's not just the – I think the argument that, well, knowing that you need to adjust the timing a little bit would certainly suggest to somebody that, you know, if the timing is way off, you really need to adjust it. That's not actually what the problem here was or what these claims are about. It's not about adjusting. It's about knowing when to ignore, when it's safe to ignore timing deviation information. That was a problem that was unresolved, and it was a problem in the establishment of initial synchronization. And R1 is not talking about that. R1 is just talking about, you know, do you – if you've already applied a command, do you apply it again, which is a different problem that cannot arise in the system of TS36300 and the patent. And going back to R1, because the board misconstrued the claims to cover a timing deviation information can sometimes be ignored and sometimes be applied when a device is in synchronous status, it found that R1 taught this limitation. When the claims are properly construed, it does not teach this limitation. TS36300 doesn't teach this limitation, as the board found. And so absent that erroneous claim construction and the further misreading of R1, that limitation is not there. And so the proposed combination of these two prior references does not produce the claimed invention. If the court has no further questions, I am prepared to stop talking. Well, thank you. And we thank both sides and appreciate your indulgence during these trying times. The case is submitted. Thank you. Thank you, Your Honor.